**FILED**

MAR 13 2024 ᴊᴄᴍ

**THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARY CORNER,                                      )
                                                  )
                    Plaintiff,                    )
                                                  )
            v.                                    )
                                                  )   1:24-cv-02093
JULIE SU, Acting Secretary,                       )   Judge Andrea R. Wood
U.S. Department of Labor,                          )   Magistrate Judge Jeannice W. Appenteng
TRACY L. SHANKER, Chief, Division of              )   CAT. 2/Random
Enforcement, DOL, OLMS                            )
                                                  )
                    Defendants.                   )   March 13, 2024

**COMPLAINT**

Request an Administrative Review of the statement of reasons from the DOL, OLMS, dated February

15, 2024.

My complaint was that the NWIAL nor AAA follow the NWIAL Constitution regarding elections nor

the LMRDA regarding unions following their constitution, OLMS stated that was not a violation. Also,

this statement of reasons consisted of things that I did not complained to OLMS nor any other NWIAL

member. This is a concerted effort to distort federal statutes to favor my union. WANT A RERUN.

Respectfully Submitted in
Jesus Name,

*Mary Corner*
Mary Corner
PRO SE
557 47th Ave
Bellwood, IL   60104
630-263-4897
mcorner75@yahoo.com

**PAID**
RECEIPT # ᵢ𝒸𝓸𝓸3720

MAR 13 2024

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

EX A

June 26, 2023

To: Mr. Michael Purcell, District Director
    230 S. Dearborn St., Room 774
    Chicago, IL 60604

From: Mary Corner
      557 47th Ave
      Bellwood, IL 60104

Mr. Purcell, I am appealing the decision of the NEAC to the DOL, OLMS, regarding American Arbitration Association and the NWIAL 2023 Election Committee not conducting the 2023 election in accordance to the NWIAL Constitution and the LMRDA. The NEAC never stated why they consider my complaints untimely. Both of my complaints regarding NWIAL 2023 Election Committee violation of the NWIAL Constitution, the NEAC stated they were untimely. But, the NEAC never stated why they were untimely.

Requesting the DOL to run a supervise 2023 election to insured that the members are choosing our leadership and not the incumbents. Your time and effort will be greatly appreciated.

In Jesus Name,

Mary Corner

Mary Corner

Enclosures:
1. E-23-20 Protest
2. E-23-13 Protest

EX A.
P181

EX B

**U.S. Department of Labor**
Office of Labor-Management Standards
Suite N-5119
200 Constitution Ave., NW
Washington, D.C. 20210
(202) 693-0143



February 15, 2024

Mary Corner
557 47th Avenue
Bellwood, IL 60104

Dear Ms. Corner:

This Statement of Reasons is in response to your complaint received by the United States Department of Labor on June 29, 2023, alleging that violations of Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), occurred in connection with the election of officers held by the American Postal Workers Union, (APWU) Northwest Illinois Area Local (NWIAL), Local 7140, on April 28, 2023.[1]

The Department of Labor (Department) conducted an investigation of your allegations. As a result of the investigation, the Department has concluded, with respect to the specific allegations, that there was no violation of the Act that may have affected the outcome of the election. Following is an explanation of this conclusion.

You alleged that the NWIAL Constitution requires that all commercially printed ballots bear the printer's individual union label to permit positive identification of the ballots and to avoid the risk of fraudulent ballots, but the union failed to comply with this requirement.[2] You asserted that because the ballots did not contain a union label there was a possibility of ballot fraud.

---

[1] Mary Corner's June 29 complaint to the Department includes as enclosures her internal union protests to the NWIAL Election Committee and appeals to the National Election Appeals Committee (NEAC). However, the complaint itself specifically raises a single allegation. Ms. Corner alleges, "The NEAC never stated why they consider the complaints untimely. Both of my complaints regarding NWIAL 2023 Election Committee violation of the NWIAL Constitution, the NEAC stated they were untimely. But, the NEAC never stated why they was untimely." The Department considered this allegation as well as the allegations in the internal union protests attached to Ms. Corner's June 29 complaint to the Department, to the extent that they were properly exhausted within the meaning of 29 U.S.C. § 482(a).
[2] During the Department's July 6, 2023, interview of Mary Corner, Ms. Corner stated that the only issue in her complaint to the Department is that the local violated its constitution by not hiring a union printer and by failing to ensure that a union label was printed on the ballots. According to Corner, she intends to use the Department's decision regarding her June 29, 2023, complaint to work with her congressman to assist in legislating amendments to the LMRDA. Corner also stated that she is not interested in a "prolonged checking" of issues raised in her internal protests and appeals. She also stated that "other



EX B
P. 189

Section 401(e) of the LMRDA, 29 U.S.C. § 481(e), requires a union to conduct its election of union officers in accordance with its constitution and bylaws. 29 C.F.R. § 452.109; *see also* 29 C.F.R. § 452.2. Article 11, Section 12 of the NWIAL Constitution states in relevant part, "all commercially printed ballots must bear the printer's individual trade label to ensure not only union printing, but also positive identification to avoid fraudulent ballots."

The investigation found that the American Arbitration Association (AAA) supervised the 2023 election, including the printing of the ballots. The Local 7140 Election Committee (LEC) was not involved in any aspect of the ballot printing process. The investigation disclosed that the printing company AAA hired to print the ballots was a nonunion printer and, therefore, no union trade label was displayed on the ballots. Although the ballots were not printed by a union printer, the LEC chairperson stated during the investigation that Article 11, Section 12 of the NWIAL Constitution was not intended to prohibit a third-party vendor like AAA from using a nonunion printer to print the ballots. The LEC chairperson explained that the intent of this provision was to restrict the LEC's ability to duplicate or photocopy additional ballots. He further explained that "since the election committee did not run the [2023] election, and AAA handled the ballot mailing, duplicate ballots, and ballot tally" processes, "it was not necessary to have a union trade label [displayed] on the ballots."

In any event, the investigation found no evidence of ballot fraud or other ballot irregularities. The Department conducted an in-depth review of each of the 596 ballots included in the ballot count and vote tally.[3] The Department found no suspicious

issues are irrelevant." In addition, Corner explained that her complaint to the Department does not ask the agency "to check out" or "contemplate" any issues other than that the union violated its constitution by not using a union printer. Corner explained that she attached her internal protest and appeal letters to her June 29 complaint to the Department only to show that she had pursued the union's internal remedies. Corner firmly asserted that she does not want the Department to investigate any of the issues in her union protests or appeals other than that the union violated its constitution by not using a union printer.

On August 14, 2023, during an agency investigator's telephone conversation with Ms. Corner, the investigator asked Corner to sign a statement confirming that her complaint to the Secretary is limited to the ballots not bearing a union label in violation of the NWIAL Constitution. Corner stated that she will not consider signing a statement because she is not required to sign any document other than her complaint to the Secretary. Corner further stated that her complaint is "in plain writing" and clearly indicates the only issue she has raised is the ballot not bearing a union label in violation of the local's constitution. Corner was adamant that "DOL should 'stick' to investigating the only issue in her complaint. She did not include other issues in her complaint because they are 'drop weight'."

[3] Of the 598 ballot packages AAA received from the post office, two were set aside and were not opened because the members returned both their original ballot and their duplicate ballot. The AAA counted and tallied the votes for the remaining 596 ballots.

EX B
P. 2 of 9

markings or indentations on ballots indicating that they had been marked in stacks or on top of one another or voted by the same individual. In addition, there was no evidence of a pattern of erasures for one candidate and corresponding votes for the same opponent, or the frequent use of an unusually colored marker, pen, or pencil to mark the ballots. Also, the review found no evidence of subtle differences in the paper, printing, or color of the ballots indicating the ballots may have been fraudulently duplicated or photocopied. Further review showed that there were no identifying or unusual marks on the front or back of any of the voted ballots. At bottom, the Department's exhaustive examination of the ballots found no evidence of ballot fraud. Therefore, to the extent that Local 7140's failure to ensure that the ballots were printed by a union printing company and displayed a union trade label constituted a violation of the NWIAL Constitution, such violation did not affect the outcome of the election.

You, however, requested that the Secretary of Labor (Secretary) file suit to invalidate the 2023 election. The Secretary may take such legal action only if she determines that a violation of the Act occurred that may have affected the election's outcome and has not been remedied. 29 U.S.C. § 482(b); 29 C.F.R. § 452.136. This requirement serves to free unions from the disruptive effect of a voided election unless there is a meaningful relation between a violation of the Act and the results of a particular election. Thus, the Department's governing regulation makes clear, "the Secretary as a matter of policy will not file suit to enforce the election provisions unless the violations found are such that the outcome may have been affected." 29 C.F.R. § 452.5. Here, based on the investigative findings, and the evidence gathered and reviewed, supported by record facts, the Secretary found no such violation. Therefore, the Secretary is precluded from commencing a legal action to overturn the 2023 election of Local 7140 officers. 29 U.S.C. § 482(b).

Next, you alleged that the printer you hired to mail your campaign cards reported that the U.S. Postal Service's (USPS) National Change of Address (NCOA) database identified 90 bad addresses on the membership mailing list used to conduct that mailing. You asserted that these 90 members were denied the right to vote, but you did not provide a list of these individuals to the Department. Section 401(e) of the LMRDA ensures the right of every eligible member to vote for and otherwise support the candidate or candidates of the member's choice. 29 U.S.C. § 481(e); 29 C.F.R. § 452.84. In a mail ballot election, the right of every eligible member to vote must require at a minimum that a union take reasonable steps to obtain current mailing addresses for its members and to distribute election ballots to all those eligible to vote.

The investigation showed that Local 7140 made reasonable efforts to distribute ballots to all eligible voters. Based on a list compiled by the national union, Local 7140 determined that there were 1,549 members eligible to vote in the April 28, 2023,



EX B
P. 389

election.[4] On March 29, 2023, AAA mailed 1,549 ballots to the last known home addresses of such voters. The list used for the March 29 ballot mailing was current as of February 2023, and also was used for your campaign mailing.[5] The investigation disclosed that 112 of the 1,549 ballot packets contained inaccurate addresses and were returned to AAA undeliverable. The investigation found that Local 7140 mitigated these inaccuracies by taking reasonable steps to obtain new addresses for these 112 members.

In an effort to obtain better addresses for these members, the incumbent president walked around the Palatine postal facility where you are employed and asked members for their updated addresses. In addition, the Local 7140 office secretary and a steward contacted members working in the Local 7140 union office and similar areas and requested current addresses from members. Also, LEC members and union stewards approached members at their workstations and on the workroom floor and attempted to obtain members' current addresses. The investigation further showed that union officials also requested members to fill out change of address forms if members had new addresses. These officials told members to give their completed forms to a member of the LEC or to forward it to AAA. Union officials who collected completed change of address forms from members forwarded the forms to the LEC chairperson. The LEC chairperson emailed this information to AAA as quickly as possible and AAA remailed undeliverable ballots to the new addresses.

Despite these efforts, Local 7140 was able to obtain new addresses for only 87 of the 112 members whose ballots were returned to AAA undeliverable. AAA remailed undeliverable ballot packages to these new addresses. Union officials were not able to locate updated addresses for 25 of the 112 members. However, two of these 25 members contacted the union, provided their current addresses, and were mailed duplicate ballots. It does not appear that the remaining 23 members requested or were mailed duplicate ballots.[6] Thus, a small percentage of eligible voters did not receive ballots despite Local 7140's reasonable efforts. Even if this were a violation of the statute, the smallest vote margin for any contested primary office was 53 votes for the

---

[4] Over the course of the election, AAA received ballot requests from four individuals whose names did not appear on the eligibility list provided by Local 7140. The union determined that all four individuals were eligible to vote, their names were added to the eligibility list, and AAA mailed ballot packets to all four.

[5] During the investigation, Ms. Corner stated that, after the election, the printer who mailed her campaign materials gave her a list of the 90 bad addresses identified on the USPS NCOA database. Corner did not provide the list to Local 7140 or AAA. During the investigation, Ms. Corner stated that she did not intend for this issue to be part of her complaint to the Department and declined to provide the list to the agency investigator.

[6] During the investigation a union official stated that, at the time of the election, several of the remaining 23 individuals had separated from the USPS. Therefore, it would appear that they were not eligible to vote. The union official did not provide the names of these individuals.



EX B
P. 489

office of president. Thus, these 23 votes did not affect the outcome of this race. In addition, 7 of the 23 members were eligible to vote for 601 Clerk Craft Director, and 4 were eligible to vote for 601 Maintenance Craft Director. The vote margins for these craft offices ranged from 17 to 22 votes and, therefore, the outcome of these elections was not affected. The remaining members were eligible to vote for craft offices that were uncontested and won by acclamation.

Further, the March 2023 and April 2023 newsletters that Local 7140 mailed to its members included the procedures for contacting AAA and requesting duplicate ballots if members did not receive ballots in the mail. In addition, the union posted the newsletters on its webpage and on union bulletin boards located at the postal facilities. Also, the investigation showed that copies of the duplicate ballot request procedures were posted adjacent to your campaign materials on the walls, in the break areas, and on the elevators at your work facility. As demonstrated, Local 7120 made reasonable efforts to obtain updated home addresses for those members whose ballots were returned to AAA undeliverable. Thus, Local 7140 afforded eligible voters a reasonable opportunity to vote. The LMRDA was not violated.

Also, you alleged that you saw one full tray of ballots at the ballot count stuffed with 800 to 1,050 voted ballots but the AAA staff stated they received and counted only 539 ballots. Section 401(e) of the LMRDA provides that every member in good standing has the right to vote for or otherwise support the candidate or candidates of his choice. 29 U.S.C. 481(e); 29 C.F.R. §§ 452.84-85. Section 401(c) of the LMRDA requires a union to have adequate safeguards in place to ensure a fair election. 29 U.S.C. § 401(c); 29 C.F.R. § 452.110.

The investigation found no credible evidence that 850 to 1,050 ballots were voted in the election, or that AAA failed to count all the ballots. The investigation found that the ballot count was conducted on April 28, 2023, at the AAA office immediately after AAA retrieved the ballots from the post office for counting. The AAA Certification of Results for the April 28, 2023, election showed that the AAA Election Administrator received 598 voted ballots from the post office during the ballot retrieval. The investigation also found that, before leaving the post office, AAA staff placed the ballots in one or two USPS letter trays, covered the trays with sleeves, and secured the sleeves to the trays with tape. The AAA staff, election committee members, and observers signed the tape. Observers who witnessed the ballot count at the AAA office stated during the investigation that AAA staff did not break the signed seal on the trays until immediately before the start of the ballot count. None of the observers, LEC members, or candidates interviewed by the Department, who witnessed the ballot count, stated that AAA staff miscounted ballots, failed to count valid ballots, or engaged in other nefarious behavior while counting the ballots.



EX B
P. 5 of 9

In addition, a LEC member who observed the ballot count stated during the investigation that a USPS letter tray only holds 300 to 600 letters depending on the thickness of the letters. He also stated that it was an overstatement to claim that a USPS letter tray is capable of holding 1,000 or more ballot packets. The LEC member further explained that it was impossible for an individual to look at a USPS letter tray "with the naked eye" and determine the number of ballots packets in that tray. In addition, an observer stated that, while he was observing the ballot count, it was impossible for him to look at a tray of ballot packets and determine the number of packets in the tray.

Further, the Department's review of the sign-in sheet for the ballot count showed that you arrived at the ballot count and signed in two to three hours after the ballot count had already started. It therefore appears that, at the time of your arrival, some, if not all, of the ballot packets already had been removed from their trays for counting. There is no credible evidence that as many as 1,050 ballots packets were in trays when you arrived at the ballot count or that the AAA failed to count all the ballots voted in the election.[7] The LMRDA was not violated.

Finally, the investigation disclosed that you failed to comply with the process for obtaining any remedies available under the union's constitution and bylaws regarding your May 1, 2023, protest to the LEC, the May 6, 2023, appeal to the NEAC, the May 30, 2023, letter to the NEAC, and the June 29, 2023, complaint to the Department. Accordingly, you failed to properly exhaust the following allegations:

1. AAA refused to count the ballots by work facilities,
2. the union improperly conducted ballot counts on April 27 and 28, 2023,
3. Local 7140 improperly applied candidate eligibility requirements,
4. the union improperly applied election committee rules and procedures,
5. the nominations notice was inadequate,
6. the union failed to certify and publish the election rules,
7. ballot packets were mailed within Local 7140's "601 area mail zone,"
8. the union failed to inform members of the location of the ballot pick-up,
9. Local 7140 refused to allow candidates to be present for the retrieval of returned-to-sender ballots,
10. AAA refused to count all the votes received from voters employed at the Palatine and Busse facilities, and

---

[7] During the last two election cycles, AAA received fewer than 600 voted ballots. The AAA Certification of Results for the September 1, 2020, election of Local 7140 officers showed that AAA received 520 voted ballots from the post office. The AAA Certification of Results for the April 28, 2023, election showed that the AAA Election Administrator received 598 voted ballots from the post office, or 78 more ballots than the 2020 election.



EX B
P. 6 o9 9

11. NEAC failed to inform you of the basis for its finding that your internal union complaints were untimely.

Section 402(a) of the LMRDA requires a complaining union member either to have properly exhausted the remedies available under the labor organization's constitution and bylaws or to have invoked such available remedies for three months without receiving a final decision as a prerequisite to filing a valid complaint with the Secretary of Labor. 29 U.S.C. § 482(a). The purpose of the exhaustion and invocation provisions is to preserve, to the maximum extent feasible, the independence of the labor organization from unnecessary governmental interference, by giving the labor organization the first opportunity to cure any defects in its election process.

The remedies available under the APWU Constitution and Bylaws, as amended August 23, 2018, are set forth in Article 12, Section 8 of the governing documents. This provision provides, in part:

> Any member who feels aggrieved in connection with the conduct of a local, state, or regional election shall file their grievance with the election committee within seventy-two (72) hours after the grievance arises . . . Appeals from the decision of the election committee shall be to the National Election Appeals Committee within five (5) days from receipt of the decision of the affiliate's election committee. The decision of the National Election Appeals Committee is final.

1. The investigation found that your May 1, 2023, protest to the LEC alleging that you requested but the AAA refused to count the ballots by work facilities failed to comply with these available union remedies. The investigation showed that the election committee denied this allegation by email later that evening. Under Article 12, Section 8 of APWU Constitution and Bylaws you were required to appeal this May 1, 2023, adverse decision to the NEAC within five days from your receipt of that decision. However, you never appealed this allegation to the NEAC.

2. Also, your May 6, 2023, protest to the NEAC alleging that the union improperly conducted ballot counts on April 27, 2023, and April 28, 2023, was procedurally deficient. The union's governing documents mandate that a grievance be protested to the LEC prior to filing an appeal with the NEAC. However, you never protested this issue to the LEC.

Consequently, you failed to properly exhaust the available remedies under Article 12, Section 8 of the APWU Constitution and Bylaws concerning your May 1 protest to the LEC and the May 6 protest to the NEAC. As a result, you did not comply with the

EX B
P.7 of 9

provision in Section 402(a) of the LMRDA requiring a member to exhaust such remedies before filing a complaint with the Secretary. Therefore, the May 1 protest to the LEC regarding AAA's refusal to count the ballots by work facilities and the May 6 protest to the NEAC claiming that the AAA conducted two ballot counts are not properly before the Secretary and are dismissed.

3-10. In addition, you failed to comply with the available remedies under the union's governing documents regarding your May 30, 2023, appeal letter to the NEAC. In that letter you raised for the first time a myriad of allegations relating to the candidate eligibility requirements, the election committee rules and procedures, the inadequacy of the nominations notice, and the union's failure to certify and publish the election rules. You also raised issues alleging that ballot packets were mailed within Local 7140's "601 area mail zone," the union's failed to inform members of the location of the ballot pick-up, refused to allow candidates to be present for the retrieval of returned-to-sender ballots, and the AAA refused to count all the votes received from voters employed at the Palatine and Busse facilities.

The union's governing documents required you to protest these matters to the LEC before raising them with the NEAC. However, you never protested these issues to the LEC. Thus, you failed to properly exhaust the available remedies in the APWU Constitution and Bylaws regarding these issues. As a result, you failed to comply with the provision in Section 402(a) of the LMRDA, 29 U.S.C. § 482(a), requiring a member to exhaust such remedies before filing a complaint with the Secretary. Therefore, these matters are not properly before the Secretary and are dismissed.

11. Finally, your June 29, 2023, complaint to the Department raised a single specific allegation[8] concerning the NEAC's failure to inform you of the basis for its finding that your internal union complaints were untimely.[9] As previously discussed, the relevant provision of the APWU Constitution and Bylaws requires a member to file a grievance with the LEC within the timeline prescribed in the governing documents. Appeals from decisions of the LEC may be taken to the NEAC. In order to file a valid complaint with the Secretary you were required to first invoke these available union remedies with the LEC and the NEAC. However, you did not invoke these remedies with the LEC or the NEAC before submitting a complaint to the Secretary. Consequently, you failed to comply with the requirements of Section 402(a) of the LMRDA, 29 U.S.C. § 482(a), your

---

[8] Ms. Corner's complaint to the Department stated generally that it was an appeal of NEAC's decision "regarding American Arbitration Association and the NWIAL 2023 Election Committee not conducting the 2023 election in accordance [with] the NWIAL Constitution and the LMRDA." This general statement does not relieve Corner of the requirement to properly exhaust each of her allegations at every stage of the union's internal process, or for three months without obtaining a final decision, in accordance with 29 U.S.C. § 482(a).

[9] The NEAC found Ms. Corner's May 6, 2023, and May 30, 2023, appeals to the NEAC untimely.



Ex B
P. 8 89

Page 9 of 9

complaint concerning this matter is not properly before the Secretary and is dismissed.[10]

For the reasons set forth above, the Department has concluded that there was no violation of the LMRDA that may have affected the outcome of the election. Accordingly, the office has dismissed your complaint and closed its file in this matter.

Sincerely,

For
Tracy L. Shanker
Chief, Division of Enforcement

cc:     Mark Dimondstein, President
        American Postal Workers Union
        1300 L Street NW
        Washington, DC 20005

        Dave Baskin, President
        APWU Northwest Illinois Area Local 7140
        194 W. Lake Street
        Elmhurst, IL 60126

        Beverly Dankowitz, Associate Solicitor
        Civil Rights and Labor-Management Division

---

[10] Notably, this is the third time, in recent filings, Mary Corner has raised an issue to the Department relating to the timeliness of her union election grievances. *See Corner v. Acosta*, No. 17-cv-08134 (N.D. Ill., June 13, 2018), Def. Reply, Dkt. 32, n.1; *Corner v. Walsh*, No. 21-cv-02867 (N.D. Ill., Aug. 10, 2021), Am. Comp., Dkt. 11-1, ¶¶ 3-4, 6. In her June 29, 2023, complaint to the Department, Ms. Corner again raised an issue relating to the timeliness of her appeal to the NEAC. Ms. Corner complained that the NEAC failed to explain the basis for its decision that her complaints were untimely. However, the LMRDA does not expressly require labor organizations to do so but does specifically provide union members a complaint-filing process to the Secretary to resolve union officer election disputes, if the member has "exhausted the remedies available under the constitution and bylaws of such organization and of any parent body . . . without obtaining a final decision within three calendar months after their invocation . . . ." 29 U.S.C. § 482(a).

EX B
P.9 8 9

EXHIBIT C

Good evening, Election Committee NWIAL

I have received my ballot. I've noticed that it is not Union printed per your Conversation with Mary Corner and I, Janice Alexander Scott on March 24, 2023. Mary Corner and I was present when viewing the membership list. You stated to Mary and myself that this was only a sample ballot, as well as the ballots and materials would be Union printed.

*"All commercially printed ballots must bear the printer's individual trade label to insure not only union printing, but also positive identification to avoid fraudulent ballots."*
- *Page 19, NWIAL Constitution, Section 12*

This is a violation of the constitution, I asked that it please be corrected.

Janice Alexander Scott
*Treasurer Candidate*

Ex. C
P. 1 of 1